# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-3514

_____

| | | |
|---|---|---|
| Anthony and Louise Jones, | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| James F. Ralls, Jr., Stacey Daniels, | * | |
| Jeffrey J. Simon, Joseph J. Mulvihill and | * | |
| Emmanuel Cleaver II, in their official | * | |
| capacities as members of the Board | * | |
| of Police Commissionersof Kansas City, | * | |
| Missouri; Bradford Chirnside, Kurtis | * | |
| Schmidt, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  June 16, 1999
Filed: August 19, 1999

_____

Before BOWMAN and HEANEY, Circuit Judges, and LONGSTAFF,[1] District Judge.

_____

RONALD E. LONGSTAFF, District Judge.

_____

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa, sitting by designation.

Anthony Jones and his mother Louise appeal the district court's[2] judgment and the jury's verdict in their civil rights suit against two police officers and the Board of Police Commissioners that oversaw the officers ("the Board"). On appeal appellants argue several points in which the district court allegedly abused its discretion. We affirm.

I.

On June 7, 1994, Kansas City, Missouri police officers Kurtis Schmidt and Bradford Chirnside responded to a call reporting a person running in traffic while slapping at cars. Upon the officers' arrival at the scene, the reporting parties complained that a black man wearing dark jeans and a light blue shirt had run in front of their car, forcing them to stop. They also indicated the man had tried to enter their car, saying "they were after him."

The officers searched the area, and observed a man fitting the description running in the middle of a street. The officers pulled alongside the man, who was eventually identified as appellant Anthony Jones. As the officers approached Jones, he stopped and turned to face the car. Officer Schmidt observed that Jones was sweating profusely and foaming at the mouth. The officers instructed Jones to place his hands on the squad car, which he did. Jones then told the officers: "They're after me. They shot me in the back." The officers found no sign of a gunshot wound or any other type of injury on him.

---

[2]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

The officers observed that Jones appeared excited. When asked, Jones would not answer several basic questions. He told the officers, "Let me in the car before they find me," and attempted to enter the squad car. At that moment, one of the officers placed Jones' hand back on the squad car. Jones then said, "Man, call the police, they wanna kill me." The officers made several attempts to inform Jones that they were the police and that no one was going to kill him. Jones made a second attempt to get in the squad car, saying that "they" would kill him again if he did not leave the area.

The officers decided to take Jones into protective custody because of his inability to care for himself,[3] and placed handcuffs on him. After being handcuffed, Jones began to struggle with the officers. The officers placed him face down on the pavement and Officer Schmidt applied a kneeling wristlock on the subject's left arm while Officer Chirnside called for a vehicle to transport Jones to an appropriate facility. Jones continued to struggle against the wristlock, attempting to get up and roll over. Officer Chirnside, wearing rubber gloves, replaced Officer Schmidt in the wristlock position. Jones stopped struggling after two or three minutes. Officer Chirnside released the kneeling wristlock and applied an ordinaryl wristlock to control him. After he stopped struggling, Jones closed his eyes and continued to mumble. When Jones stopped mumbling, one of the officers shook him to check on his condition. He did not respond. Although his eyes were open, he appeared barely conscious. The officers then rolled Jones into a seated position leaning against the squad car rear bumper.

---

[3]The determination was based on the officers' observations: Jones was running down the middle of the street, placing himself in danger from oncoming traffic; Jones was experiencing hallucinations of being shot and chased; Jones' physical appearance (he was covered in sweat and foaming at the mouth); and Jones' inability to communicate logically with the officers.

The fire department responded to the officers' request for emergency service assistance. Jones remained seated on his own, with open eyes, and appeared to be breathing normally. After approximately two minutes on the scene, fire department personnel requested that the handcuffs be removed, because they were having trouble finding a pulse on the subject. The handcuffs were removed and Jones was laid prone on the ground. Fire department personnel performed CPR, and an emergency service transported Jones to the hospital.

At the hospital, medical personnel indicated Jones was in stable condition but appeared to be under the influence of narcotics. He also had a blood alcohol level of .108. He went into a coma at the hospital and remains in a vegetative state. Jones and his mother filed a civil rights suit, pursuant to 42 U.S.C. § 1983, against Officers Chirnside and Schmidt, as well as the members of the Board of Police Commissioners of Kansas City (in their official capacities). The suit alleged Officers Burns and Chirnside used excessive force and failed to attend to Jones' medical needs, and the Board failed to adequately supervise and train the officers. The complaint also included a state law claim against the officers.

On April 29, 1998, a jury returned a verdict in favor of defendants on all counts. The district court entered judgment on the verdict and denied all post-trial motions. On appeal, Jones and Mrs. Jones allege the district court abused its discretion in several of its rulings at trial, specifically: (1) permitting appellees' presentation of a kneeling wristlock; (2) asking potential jurors one question about substance abuse at voir dire; (3) dismissing a juror after the trial had begun when the juror disclosed by a note to the judge that her sister worked at the hospital where Jones was a patient; (4) excluding Jones from the courtroom and permitting the officers to wear their standard police uniforms at trial; (5) restricting the reading of certain deposition testimony of defendants Schmidt and Chirnside; (6) requiring the deposition testimony of defendants Schmidt and Chirnside which had not been read

into evidence to be blacked out before being introduced as exhibits and provided to the jury; (7) permitting a defense expert to testify that a combination of cocaine and alcohol caused plaintiff's coma, although the expert did not know how much cocaine was in Jones' system; and (8) permitting Officer Chirnside to testify about his observations and intentions regarding Jones. Appellants also argue the district court erred in denying a motion to file a third amended complaint and to add new defendants and thirteen new causes of action, and the aggregate effect of the district court's errors warrant reversal.

## II.

We first address appellants' argument that the district court improperly permitted a courtroom presentation of the kneeling wristlock Officers Schmidt and Chirnside used on Jones. Appellants characterize the kneeling wristlock demonstration as "deliberately false and misleading," argue appellees laid "no foundation whatsoever" for the demonstration, and contend the prejudicial impact of the "so-called 'demonstration'" outweighed its probative value. Brief of Appellants, at 21, 29-30. We review the district court's evidentiary rulings for abuse of discretion. See Goff v. Bise, 173 F.3d 1068, 1074 (8th Cir. 1999).

At trial, appellees' counsel informed the court of his plan to show the jury how officers use the kneeling wristlock. Tr. 1586. The court asked for a description of what would be presented, and counsel indicated "[w]e would have him on the ground in handcuffs and all we would have the officer intend to come and indicate how they held him [sic]." Tr. 1586-87. The court informed counsel she would only permit the participants to show exactly what they did, to which counsel replied, "We are not going to engage in some type of a fight or struggle. I want them to show you how they knelt, how they did his hand and how they would

go forward." Tr. 1587. Although plaintiffs' counsel objected, the court noted, "I will permit you to explore in cross-examination differences between their testimony." Tr. 1589.

Immediately prior to the presentation, Officer Schmidt demonstrated the kneeling wristlock to the court, while the jury was excluded from the courtroom. Tr. 1674. The court approved the presentation as it was performed to her. The court and defendants' counsel made clear the presentation would be limited to the control tactic used after handcuffing, and would not involve a demonstration of the handcuffing tactic. Although defendants' sought permission to have Officer Chirnside demonstrate the wristlock after Officer Schmidt did so, the court found the duplicative presentation unnecessary. Tr. 1675-76.

At the time of the presentation, the following exchange took place before the jury:

THE COURT: He is going to demonstrate what a kneeling wrist lock is according to him; is that correct?

MR. CLOSE (counsel for defendants): Yes, Ma'am.

THE COURT: So this is not a complete demonstration of the entire events?

MR. CLOSE: No, ma'am, because we are not asking the witness to move or struggle in any way according to the testimony of the officers. We're just establishing the wrist lock, itself.

THE COURT: You may proceed.

Q (by Mr. Close): Would you show the jury how you held Mr. Jones by the hand or arm, if you did?

A (Officer Schmidt): Just his left hand, I would have had cupped with my right hand, and would have had my other hand on his elbow.

Q: Okay. Now, you are saying you would have. Is that how you had Mr. Jones on June 7, 1994?

A: Yes. That's how I performed all my wrist locks.

Q: And you are in a position which basically it appears that you are on the balls of your feet; is that correct?

A: Yes, I am. I am on the balls of my feet right now.

Q: Is that how you were with Mr. Jones?

A: Yes, sir, I was.

Q: Is that how you held Mr. Jones to the ground?

A: This is how I had him when he wasn't combative.

Q: If Mr. Jones got combative, would you demonstrate to the jury what you would have done?

A: Mr. Jones becomes combative and tries to roll over or to get up or roll either way, all I could do is lean forward putting my right knee near his buttocks area and left knee on the shoulder region and I could keep him from rolling over. When he stops struggling, all I have to do is roll back and take my weight off.

Q: Is that what you did with Mr. Jones?

A: That is what I did with Mr. Jones.

Tr. 1706-07.

The admissibility of experimental and demonstrative evidence "depends upon a foundational showing of substantial similarity between the tests conducted and what they purport to represent." Kehm v. Proctor & Gamble Mfg. Co., 724 F.2d

613, 624 (8th Cir. 1983); <u>see also</u> <u>Ramseyer v. General Motors Corp.</u>, 417 F.2d 859, 864 (8th Cir. 1969).  Appellants set forth thirteen discrepancies between the kneeling wristlock demonstration before the jury and the June 7, 1994 events involving Officers Schmidt and Chirnside and Anthony Jones.[4]

---

[4]Plaintiffs state as discrepancies:

(1) Mr. Jones is black man [sic]; Officer Cooley [the person receiving the kneeling wristlock in the courtroom] was white; (2) Mr. Jones is 5' 8" tall; Officer Cooley is 6' tall; (3) Mr. Jones weighed 140 pounds on June 7th; Officer Cooley weighed 180; (4) Mr. Jones was dressed in a tee-shirt, jeans and tennis shoes; Officer Cooley was dressed in full uniform and wearing black boots; (5) both Defendants Chirnside and Schmidt testified in their depositions that during the time they were each "restraining" Mr. Jones, they had one knee between Mr. Jones' shoulder blades and one knee above his buttocks, and at no time in the demonstration was that ever done; (6) both Defendants Chirnside and Schmidt testified in their depositions that they were in a single position, <u>i.e.</u>, with one knee between Mr. Jones' shoulder blades and one knee above Mr. Jones' buttocks, for an uninterrupted period of time the length of which they themselves estimated, while the "demonstration" showed an intermittent or on-again-off-again use of one knee, but only on a shoulder; (7) Officer Schmidt testified in his deposition that he was in position, <u>i.e.</u>, kneeling with one knee between Mr. Jones' shoulder blades and one knee above Mr. Jones' buttocks for one to two minutes, while Officer Chirnside testified that he was in the same position for two to three minutes, but they were allowed to testify at trial that it was only one minute each, and to "demonstrate" for a period of approximately one minute; (8) in their depositions, Officers Chirnside and Schmidt testified that while Officer Schmidt was "restraining" Mr. Jones, Officer Chirnside was holding Mr. Jones' legs up in the air, bent the knee for at least part of the time, whereas that did not occur in the "demonstration;" (9) Mr. Jones had been running or undergoing some sort of physical activity that left him breathless when he was first encountered by Defendants Chirnside and Schmidt and handcuffed, while Officer Cooley was breathing normally; (10) the "demonstration" took place on carpet, an obviously flexible or cushioned

We agree with appellants that the courtroom demonstration did not accurately reflect the entire course of events involving the officers and Jones on June 7. However, the presentation was not intended to reenact the June 7 events, and we find appellants' characterization of the demonstration misguided. The trial transcript indicates the jury was notified immediately prior to the demonstration that it was not a reenactment of the June 7 events; rather, its purpose was to inform and show the jurors precisely how an officer would apply the technique. It is within reason that such a demonstration would assist a jury of laypeople, unfamiliar with law enforcement techniques, in understanding the kneeling wristlock technique. A demonstration of the tactic would be particularly relevant in the instant case, because the jurors ultimately had to consider whether the tactic, and the manner in which it was applied, contributed to or caused Mr. Jones' injuries.

---

surface which subtly enhances the body's ability to breathe because of that flexibility, while the actual event took place on concrete or asphalt, which obviously does not "give;" (11) the "demonstration was done by only one of the officers involved, Defendant Schmidt, whereas both [emphasis in original] officers sequentially knelt on Mr. Jones' back according to their deposition testimony, and defense counsel elicited the express testimony of Defendant Schmidt that what he did in the demonstration was what Defendants Chirnside and Schmidt did on June 7, 1994; (12) the "demonstration" was actually a purported reenactment of the events of June 7, 1994, rather than a good faith effort to visually show abstract principles; (13) the "demonstration" was done by Defendant Schmidt who is the smaller of the two officers, and it was Defendant Chirnside who was by his own deposition testimony on Mr. Jones longer than defendant Schmidt on June 7, 1994, and at the time Defendant Chirnside weighed 205 pounds–in comparison to Mr. Jones' 140 pounds.

Brief of Appellants, at 24-26.

Appellants also overlook the fact that cross-examination afforded them the opportunity to impeach Officer Schmidt's representations about how he performed the kneeling wristlock on Jones, and to draw out other differences in the courtroom environment and the actual events of June 7, 1994. "Perfect identity between experimental and actual conditions is neither attainable nor required.... Dissimilarities affect the weight of the evidence, not its admissibility." Kehm, 724 F.2d at 624 (internal citations omitted).

We find nothing unduly prejudicial about appellees' kneeling wristlock presentation., and conclude the district court did not abuse its discretion in permitting the demonstration.

### III.

We have carefully considered appellants' remaining points of appeal. After reviewing the record, we find no abuse of discretion in the district court's rulings. For the reasons stated above, we affirm the judgment of the district court.

A true copy.

Attest:


CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT